IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| SONDRA WILSON, | ) | Civil No.: 3:14-cv-01091-JE |
| | ) | |
| Plaintiff, | ) | OPINION AND ORDER |
| | ) | |
| v. | ) | |
| | ) | |
| PROVIDENCE HEALTH & SERVICES – | ) | |
| OREGON, dba PROVIDENCE | ) | |
| BENEDICTINE NURSING CENTER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Thomas K. Doyle
Bennett Hartman Morris & Kaplan, LLP
210 SW Morrison Street, Suite 500
Portland, OR 97204

       Attorney for Plaintiff

Janine C. Blatt
Jeffrey Druckman
Druckman & Blatt, PC
0424 S.W. Iowa Street
Portland, OR 97239

       Attorneys for Defendant

OPINION AND ORDER – 1

JELDERKS, Magistrate Judge:

Plaintiff Sondra Wilson brings this employment related action against her former employer, Providence Health & Services.  Plaintiff brings claims under state and federal law alleging discrimination and retaliation based on disability, use of family medical leave, wage claims, and whistleblower status. Defendant asserts a counterclaim for attorney fees and costs. Defendant now moves for summary judgment on all of Plaintiff's claims.

This court has federal question jurisdiction over the FMLA claim pursuant to 28 USC § 1331 and 29 USC § 2617(2), and supplemental jurisdiction over the state law claims under 28 USC 1367(a).

The Court heard oral argument on July 6, 2015 and issued an Order from the bench indicating that this written Opinion and Order would follow.  The Court granted Defendant's motion for summary judgment as to all of Plaintiff's claims for the reasons set forth below.  In addition, on its own motion, the Court denied Defendant's counter claim for attorney fees.


## Claims

Plaintiff brings six claims.

Plaintiff's First Claim alleges that Defendant interfered with her right to protected medical leave in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654 by considering her use of protected medical leave as the basis for its corrective action and termination decisions.

Plaintiff brings her Second Claim pursuant to O.R.S. 441.178, alleging that Defendant retaliated against her for disclosing alleged safety violations to a public agency.

Plaintiff's Third Claim alleges that Defendant violated O.R.S. 652.355 by retaliating against her for filing a wage claim.

Plaintiff's Fourth Claim alleges disability discrimination under state law.

Plaintiff's Fifth Claim alleges interference with protected medical leave under the Oregon Family Leave Act ("OFLA"), O.R.S. 659A.150–659A.186.

Plaintiff's Sixth Claim alleges that Defendant violated O.R.S. 659A.199 by retaliating against her for reporting information she believed evidenced violations of state rules regulating nurse staffing levels.


### Background

Defendant Providence Health & Services, doing business as Providence Benedictine Nursing Center ("PBNC") provides short-term inpatient care and geriatric health care services at its nursing center in Mount Angel, Oregon.  The campus houses a primary nursing center, an assisted living facility, home health agency and a short stay skilled nursing unit ("SSU").  Plaintiff, a registered nurse ("RN"), began working at PBNC as a night-shift charge nurse in the SSU in December, 2007.  Following events that will be described below, Plaintiff was discharged from her employment with Defendant effective December 16, 2013.  Plaintiff's termination letter is signed by PBNC Director of Nursing Tracy Thompson.

The job description for Plaintiff's position includes the principal duties of providing comprehensive resident assessments; implementing an individualized plan of care using good nursing practices; demonstrating the ability to prioritize and organize work; administering medications and treatments per physician orders; communicating the plan of care and changes to nursing staff; safeguarding resident rights as listed in the "Resident's Bill of Rights;" and

completing documentation including medication sheets, progress notes, incident reports and care plans. One RN and three certified nursing assistants (CNAs") worked in the SSU during the night shifts. Another RN worked elsewhere in the facility. In November, 2013, Defendant added a licensed practical nurse ("LPN") to the SSU night shift staff.

Starting in the summer of 2011, Plaintiff applied for and was granted protected FMLA/OFLA leave for a medical issue related to her right hand. Plaintiff returned to work sometime in September, 2011 to the same position she held prior to her leave.

In a letter dated June 3, 2012, Plaintiff wrote PBNC's Executive Director, Emily Dazey, disputing and requesting payment of withholdings from her paycheck for meal breaks that Plaintiff contended she did not take. In her letter Plaintiff asserted that there was no one during her shift to cover her duties and that she had not taken a meal break since starting work at PBNC.

In the autumn of 2012 Plaintiff began suffering from an unexplained illness. Symptoms included fever, fatigue, body aches and headaches.

In a document dated January 21, 2013, Defendant issued Plaintiff a "Corrective Action Notice" documenting a verbal warning regarding several performance issues. The stated reasons for the disciplinary action included: exceeding the number of absences set out in the company's attendance policy, a report that Plaintiff was "rude" to a patient, a medication error in which Plaintiff administered the wrong medication to the wrong patient, and a report that Plaintiff was unable to finish her shift duties "due to having a health issue – that your speech was rambling and unclear and unsteady on your feet . . . ." Def. Ex. 10. According to notations on the document, Plaintiff refused to provide her signature acknowledging receipt of the notice.

In a letter dated April 15, 2013, an attorney representing Plaintiff acknowledged Defendant's determination that it owed Plaintiff a sum of $8,454.77 in back wages for the missed

meal breaks.  However, the attorney sought payment for an additional amount of back wages

Plaintiff claimed she was owed.  The matter was referred to Defendant's Human Resources

Consultant, Gary Baysinger, and was resolved by payment of the full amount Plaintiff claimed.

Baysinger sent Plaintiff's attorney a letter dated April 25, 2013 informing him that Defendant

would be issuing payment.  In his Declaration, Baysinger states that he did not discuss Plaintiff's

wage claim with PBNC Director of Nursing Tracy Thompson.  Thompson did not start in her

position as Director of Nursing until April 24, 2013. Thompson Decl. ¶2.

In late summer 2013, Plaintiff again began experiencing symptoms that her primary care

physician attributed to the relapse of an "unexplained febrile illness" that was likely viral in

nature. Around August 23, 2013, Plaintiff applied for and was granted FMLA/OFLA leave.

Defendant approved leave originally through October 11, 2013 and then extended it to

November 8, 2013.  In a letter dated November 8, 2013, Defendant notified Plaintiff that, as of

that date, she had exhausted her leave under FMLA and OFLA but was entitled to an additional

week of leave under Defendant's Company Medical Leave program.  Plaintiff returned to her

same position at the conclusion of her leave having been released to full duty with no restrictions

by her health care provider and able, according to her own testimony, to perform all of her job

functions.

In deposition, Plaintiff testified that she complained in a letter to "the surveyors"

regarding staffing issues at PBNC but she could not identify who these surveyors were except

that they visited PBNC and their address was in a binder at the front desk.  According to her

deposition, Plaintiff made her complaint anonymously and did not keep a copy of the letter.  She

testified that she thought she sent the letter in 2012 but could not recall when specifically in

2012. In her May 11, 2015 Declaration, Plaintiff asserts that she wrote the complaint letter to state licensing surveyors in the fall of 2013.

Plaintiff was on duty in the SSU for the shift beginning the night of December 1st and ending the morning of December 2nd, 2013. It was established practice in the SSU to have the night shift RN dictate a report into a tape recorder at the end of the shift, communicating the events of the night and recording anything of importance for the next shift. The tape recorded report takes the place of an in-person hand-off to the oncoming nurse.

Plaintiff dictated her night shift report the morning of December 2, 2013 after her shift ended. According to Thompson's Declaration, the nurses on the day shift who listened to Plaintiff's report brought the taped report to the attention of SSU Resident Care Manager, Darlene Bleakney. Bleakney, in turn, brought the recording to Thompson. In her Declaration, Thompson states that she listened to the report and had several concerns about Plaintiff's care of patients during the December 1st/2nd shift and Plaintiff's "scattered and disorganized thoughts."

Thompson listened to the report on the evening of December 2nd. On the morning of December 3rd, Thompson contacted Human Resources to "formulate a plan for Ms. Wilson regarding her continued employment . . . ." Def. Ex. 1. Thompson documented her concerns and also detailed the steps she followed as she performed an investigation. Id.
The report details excerpts from Plaintiff's own tape recorded report and the information Thompson gathered from interviews with the CNA's and the LPN who were also on duty in the SSU with Plaintiff on the December 1st/2nd night shift.

Thompson's investigative summary states that Plaintiff's taped report included comments that one patient has "voiding issues, I don't know what those issues are" and "has a blood pressure of 160/90, I hope there is an anti-hypertensive." In her deposition testimony Plaintiff

testifies that she does not recall whether she followed up to find out what the patient's voiding issues were. She testified that she could not memorize medications for every patient and would have to look at a patient's medication list to know whether there was medication for a patient with a blood pressure issue. She does not remember if she did any intervention for this patient.

According to the investigation summary, Plaintiff reported on tape that "I don't know if meds have been changed . . . ." In her deposition, Plaintiff acknowledged that it was "everybody's job" to know whether there had been a medication change for a patient.

In deposition testimony, Plaintiff acknowledges that she gave a report on a patient who had been transported to the hospital several hours before her shift started [as] though the patient was still at the nursing center.

The investigation summary states that Plaintiff commented on her taped report that one patient's "skin around colostomy reported excoriated, so far so good from my understanding." The summary also includes a report by one of the CNA's who worked with Plaintiff during the December 1st/2nd shift that this patient's "colostomy bag blew off and this was immediately reported to [Plaintiff]. [Plaintiff] did not assess the patient for 4 hours and was reminded several times . . . that poop was oozing out onto patient's skin and bedding. [The CNA] has to make several linen changes during this period." Def. Ex. 1.

At deposition, Plaintiff was asked about a patient who had undergone knee replacement surgery, was suffering from complications and had developed a fever. Plaintiff acknowledged that the CNA's had told her about the fever several times during her shift. Plaintiff does not remember whether she administered medication or how long it was after she was first informed of the fever that she contacted a doctor. Plaintiff testified that the patient had a fever during the swing shift and was given medication but it did not resolve the issue. She testified that "after it

was already evident that a simple antipyretic was not effective, I think I called the doctor." According to Thompson's Declaration, this patient was sent back to the hospital where it was determined that she had an infection severe enough to require amputation of her leg below the knee.

After interviewing the other night shift staff, Thompson met with Plaintiff on December 5, 2013 with the assistance of Emily Dazey. Thompson reviewed each of her concerns related to the taped report and provided Plaintiff an opportunity to address the allegations regarding her conduct. For the majority of issues Thompson identified, Plaintiff stated that the report room was warm and that she frequently "nods off" during the report. Plaintiff admitted in her deposition that she told Thompson and Dazey that she could not explain why she would give a report on a patient who was not in the building. She also testified that she didn't remember whether she denied any of the allegations that were brought to her attention but that she did tell them "It was a crappy report that I gave." According to Thompson, Plaintiff did not deny any of the incidents brought to her attention during their meeting.

Plaintiff was terminated from her employment effective December 16, 2013. In her Declaration, Thompson asserts that she made the termination decision after conferring with Dazey and Human Resources Consultant Michelle Garza and based her decision to terminate Plaintiff entirely on Plaintiff's actions during her December 1st/2nd shift. Thompson subsequently reported the matter to the Oregon State Board of Nursing. Thompson asserts in her Declaration that at the time of her decision she was not aware of and did not consider any corrective action or discipline that Plaintiff had previously received. She also states that, at the time, she was not aware of any disclosure by Plaintiff to anyone of any alleged violations that posed health, safety or welfare risks; that she had no knowledge of any complaint Plaintiff may

OPINION AND ORDER – 8

have made about staffing levels or any other condition at PBNC and that Plaintiff had never made a complaint, report or disclosure to her regarding any of these issues. Thompson also asserts that at the time of the termination decision she never knew anything about any medical condition or disability Plaintiff may have had and that Plaintiff had not requested Thompson to provide any accommodation or job modification. Finally, Thompson asserts that at the time of the termination decision she had no knowledge of any claim for unpaid wages that Plaintiff may have asserted against Defendant.

According to a series of Letters of Determination, the Oregon Department of Human Services Office of Licensing and Regulatory Oversight received complaints regarding the events that occurred at PBNC on the night of December 1st/2nd. Def. Exs. 2 – 4. The Department found that Plaintiff "failed to asses and provide timely care for [a patient's] leaking colostomy bag;" "failed to assess and provide intervention regarding [a patient's] un-bandage [sic] heel and reported fever for over three hours even after several reminders;" and "incorrectly told [a patient] that [the patient] was going to the hospital, causing [that patient] anxiety . . . received an order for [the patient's] anxiety at 1:30 A.M. But failed to deliver the medication until 2:10 A.M. after being reminded . . . ." The Department found that Plaintiff's conduct in the first two matters resulted in "neglect and abuse" and that Plaintiff's individual responsibility for abuse was substantiated.

An investigator from the Oregon Board of Nursing met with Plaintiff in February 2014. Plaintiff was represented by counsel at the meeting and testified at her deposition that "I'm sure there was" discussion of her conduct during her last shift at PBNC. Plaintiff testified that the investigator also asked her about her medical conditions and the medications she was using. On April 3, 2014, Plaintiff signed an Interim Consent Order issued by the State Board of Nursing

that "pending further Order of the Board, the licensee for medical reasons is prohibited from practicing as a Registered Nurse in any capacity or functioning as a caregiver in any setting."  As of January 29, 2015, the date of Plaintiff's deposition, that Order was still in effect.

## Evaluating Motions for Summary Judgment

Federal Rule of Civil Procedure 56 authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show the absence of an issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The moving party may discharge this burden by showing that there is an absence of evidence to support the nonmoving party's case.  Id.  When the moving party shows the absence of an issue of material fact, the nonmoving party must go beyond the pleadings and show that there is a genuine issue for trial.  Id. at 324.

The substantive law governing a claim or defense determines whether a fact is material. T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987). Reasonable doubts concerning the existence of a factual issue should be resolved against the moving party.  Id. at 630-31.  The evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985).  No genuine issue for trial exists, however, where the record as a whole could not lead the trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

<u>Discussion</u>

**I.  <u>Violations of FMLA and OFLA</u>**

Plaintiff brings interference claims under the Family Medical Leave Act (FMLA), 29

U.S.C. §§ 2601–2654 and the Oregon Family Leave Act (OFLA), O.R.S. 659A.150–659A.186.

Specifically, Plaintiff alleges that as a result of her taking protected leave, Defendant subjected

her to greater scrutiny and took corrective action against her, including ultimately terminating

her employment.

**A. Standards**

The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided" by the Act. 29 U.S.C. § 2615(a)(1).

The regulations explain that an employer is thus prohibited from considering the use of family

medical leave as a negative factor in corrective action or discharge decisions. <u>Bachelder v.

Am.W. Airlines, Inc.</u>, 259 F.3d 1112, 1122 (9th Cir. 2001) (<u>citing</u> 29 C.F.R. §825.220(c)).

The OFLA prohibits an employer from retaliating or in any way discriminating against an

employee who has submitted a request for family leave or has inquired about or invoked any

provision of the statute.  O.R.S. 659A.183(2). OFLA is to be "construed to the extent possible in

a manner that is consistent with any similar provisions" under FMLA, O.R.S. 659A.186(2), and

thus, Oregon courts have looked to federal law when interpreting OFLA." <u>Sanders v. City of

Newport</u>, 657 F.3d 772, 783 (9th Cir. 2011) (<u>citing</u> <u>Yeager v. Providence Health Sys.Or.</u>, 195

Or.App. 134, 96 P.3d 862, 866 (2004); <u>Centennial Sch. Dist. No. 28J v. Or. Bureau of Labor &

Indus.</u>, 169 Or.App. 489, 10 P.3d 945, 951–52 (2000)). Accordingly, the legal standards for

Plaintiff's state law OFLA claim parallel those for her FMLA claim.

To prevail on an interference claim, Plaintiff must show that she took FMLA protected leave, that she suffered an adverse employment action, and that the adverse action was causally related her FMLA leave. Bachelder, 259 F.3d at 1125. The McDonnell Douglas burden-shifting framework does not apply to FMLA interference claims. Xin Liu v. Amway Corp., 347 F.3d 1125, 1136 (9th Cir. 2003); Bachelder, 259 F.3d at 1125.

It is undisputed that Plaintiff took FMLA protected leave and that she suffered an adverse employment action. Thus, on summary judgment, the Court must determine if there exists a genuine issue of material fact as to whether there was a causal connection between Plaintiff's protected conduct and the adverse employment action. In other words, could a trier of fact conclude from the record that Defendant considered Plaintiff's use of FMLA/OFLA leave as a "negative factor" in its decision to terminate her employment.

**B. Analysis**

Citing Eighth Circuit case law, Plaintiff relies partly on the temporal proximity between her termination and her return from protected leave as evidence that Defendant considered that use of leave a "negative factor." Plaintiff also argues that Defendant's proffered reason for her termination is pre-textual. She contends that Thompson's assertion that she knew nothing about any medical condition Plaintiff may have had undermines the credibility of Defendant's stated reason for discharging her because it "is blatantly at odds with the factual record." Plaintiff's arguments are unavailing.

Defendant has produced evidence that it approved each of Plaintiff's medical leave requests and even extended her leave under its own company leave policy. Plaintiff was reinstated after each period of leave. Plaintiff received a Notice of Corrective Action in January 2013 that referenced absenteeism. However, these absences did not occur during the periods

Plaintiff was on protected leave.  When asked during her deposition whether she claimed that Defendant discriminated against her because she took medical leave, Plaintiff testified, "Not related to a leave." Pl. Dep. at 129:23-130:4.

Defendant has also produced unrebutted evidence that Thompson made the decision to terminate Plaintiff's employment and that she based her decision "entirely on Wilson's actions on her final shift." Thompson Decl. ¶15.  Those actions are documented extensively in the record and are largely undisputed.  Plaintiff does not deny the disorganized behavior, patient neglect and poor nursing care practices that are catalogued in Thompson's investigative report.  Nor does she take issue with Thompson's investigation or with DHS Determinations that found that Plaintiff's conduct constituted abuse.  The record is unrebutted on these issues and such conduct was a legitimate basis on which to terminate Plaintiff's employment.  See 29 U.S.C. § 2614(a)(3)(B); O.R.S. 659A.171 (3)(b)(employee who has taken leave not entitled to "any right, benefit or position of employment other than the rights, benefits and position that the employee would have been entitled to had the employee not taken" the leave).

Plaintiff contends that Thompson's assertion that she knew nothing about Plaintiff's claimed medical conditions is implausible because Thompson knew that Plaintiff had been out on medical leave and had telephoned Plaintiff while she was on leave. First, I point out that knowledge that an employee has been on leave does not necessarily translate into having knowledge of the particulars of the medical condition that the employee had or still has. More importantly, Thompson's knowledge that Plaintiff was on leave or even her knowledge of the reasons for that leave are irrelevant absent a showing that such knowledge was a "negative factor" in the adverse employment decision.

I recognize that temporal proximity is circumstantial evidence of a causal link. However, in circumstances such as those here, where there is an otherwise complete absence of evidence that Plaintiff's use of leave was a negative factor in the termination decision and there is an overabundance of unrebutted evidence that the decision was based on Plaintiff's conduct during her last shift, Plaintiff's assertions based on non-controlling case law that is of questionable assistance in any event, are insufficient to create a genuine issue of material fact.

Here, Plaintiff has failed to produce evidence from which a trier of fact could conclude that Defendant considered Plaintiff's use of FMLA/OFLA leave as a "negative factor" in its decision to terminate her employment. Because the McDonnell Douglas burden shifting analysis does not apply to interference claims, I decline to address Plaintiff's pretext argument except to note that the record contains unrebutted and overwhelming evidence supporting Defendant's proffered reason for Plaintiff's termination – Plaintiff's disorganized behavior and, most significantly, her neglect and abuse of patients in her care. Accordingly, I grant Defendant's motion for summary judgment as to Plaintiff's First and Fifth Claims.

## II. "Whistleblower" Claim

Plaintiff brings her Second Claim pursuant to O.R.S. 441.178, alleging that Defendant retaliated against her for disclosing alleged safety violations to a public agency. In her Sixth Claim, Plaintiff alleges Defendant violated O.R.S. 659A.199 by retaliating against her for reporting alleged violations of state rules regarding nurse staffing levels.

### A. Standards

Under the relevant provisions of O.R.S. 441.178, it is unlawful for a hospital to take retaliatory action against a nurse who discloses or intends to disclose to a public body "an activity, policy or practice of . . . a hospital that the nursing staff reasonably believes is in

violation of law or a rule or is a violation of professional standards of practice that the nursing

staff reasonably believes poses a risk to the health, safety or welfare of a patient or the public."

O.R.S. 441.178(1)(a).

> Similarly, O.R.S. 659A.199(1) provides:
>
> It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation.

To establish a *prima facie* case of retaliation under the Whistleblower Statutes, a

"[p]laintiff 'must show (1) she was engaging in a protected activity, (2) she suffered an adverse

employment decision, and (3) there was a causal link between the protected activity and the

adverse employment decision.' " Larmanger v. Kaiser Foundation Health Plan of the Northwest,

895 F.Supp.2d 1033, 1049 (D.Or. 2012) (quoting Sandberg v. City of N. Plains, No. 10–cv–

1273–HZ, 2012 WL 602434 at *6 (D.Or. Feb. 22, 2012).

To establish causation, a plaintiff must show her protected activity was a "'substantial

factor in the motivation to discharge the employee.' " Sandberg, 2012 WL 602434, at *7

(quoting Estes v. Lewis and Clark College, 152 Or.App. 372, 381, 954 P.2d 792 (1998)).

## B.  Analysis

Defendant argues that there is a complete lack of evidence supporting a causal link

between Plaintiff's alleged complaints about conditions at PBNC and her termination.  I agree.

In her deposition, Plaintiff testified that she made an anonymous report to "the surveyors"

about conditions at PBNC.  She could not identify who those "surveyors" were. Plaintiff testified

she thought she had sent the letter in 2012.  In her subsequent Declaration, Plaintiff states that

she wrote a complaint letter to state licensing surveyors in the fall of 2013.  She testified that she

did not keep a copy of the letter, she never reported to Defendant that she had made the report, and she did not know who at Providence may have learned of the report.

As noted above, Thompson's Declaration provides unrebutted evidence that her decision to terminate Plaintiff was based entirely on her conduct during her last shift. Furthermore, Defendant has produced evidence that Plaintiff never made a complaint, report or disclosure to Thompson and that Thompson and was not aware of any disclosure by Plaintiff to anyone either inside or outside of PBNC of that fell within the definitions of O.R.S. 441.174(1)(a) or O.R.S. 659A.199(1). Plaintiff does not provide any evidence that could lead a reasonable trier of fact to conclude that Plaintiff made any report to Thompson or that Thompson became aware of any of Plaintiff's complaints through other employees at PBNC or through any other means.

Furthermore, even if Plaintiff had produced such evidence, the record before the court cannot support a conclusion that any awareness Thompson had of alleged complaints was a "substantial factor" in the decision to terminate Plaintiff's employment. Plaintiff has failed to create a triable issue on the element of causation. I, therefore, grant Defendant's motion for summary as to her Second and Sixth Claims.

### III. Wage Discrimination Claim

Plaintiff's Third Claim alleges that Defendant violated O.R.S. 652.355 by discriminating against her for making a claim for unpaid wages. The statute makes it unlawful for an employer to discharge or in any other manner discriminate against an employee because the employee has made a wage claim. O.R.S. 652.355(1)(a).

Plaintiff argues that "the evidence in the record indicates that Ms. Thompson was likely aware of Wilson's wage claims." Plaintiff bases this argument on her assertion that Youngren and Dazey, who Thompson consulted during her investigation of Plaintiff's conduct, were both

aware of the claim. Defendant argues that Plaintiff's wage claim fails for lack of a causal connection between her actions and Defendant's decision to terminate her employment because there is no evidence that Youngren, Dazey, or anyone else told Thompson about the wage claim.

Defendant's argument is persuasive. The record shows that an attorney for Plaintiff submitted a letter to Defendant dated April 15, 2013 that sought payment of the remaining amount of wages Plaintiff believed she was entitled to for lunch periods she had not taken. The evidence shows that the matter was referred to Providence Human Resources Consultant Baysinger who confirmed by letter dated April 25, 2013 that payment of the full amount requested would be made to Plaintiff.

Thompson did not begin work at PBNC until April 24, 2013. In her Declaration, Thompson states that at the time she made the decision to terminate Plaintiff's employment in December 2013, she had no knowledge of either the assertion or the resolution of Plaintiff's wage claim. There is no evidence in the record that Dazey or Youngren communicated any information about the wage claim to Thompson prior to her deciding to terminate Plaintiff's employment. Absent such evidence, the inferences Plaintiff raises in her argument are purely speculative and, as such, are insufficient to raise a genuine issue of material fact.

Furthermore, as has been discussed above, Defendant has provided overwhelming evidence that it had a legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment. Even assuming that Thompson had knowledge of Plaintiff's wage claim, Plaintiff has produced no evidence to support a conclusion that the claim in any way motivated Thompson to terminate Plaintiff's employment.

On the record before the Court, no reasonable trier of fact could find that there existed a causal connection between Plaintiff's wage claim and Defendant's decision to terminate her employment.  Accordingly, Defendant's motion as to this claim is granted.

## IV. Disability Discrimination Claim

In her Fourth Claim for Relief, Plaintiff asserts a state law claim of disability discrimination.  In her Complaint, Plaintiff asserts that she was disabled, that Defendant was aware of her disability and that Defendant discriminated against her because of her disability by "subjecting her to greater scrutiny, taking corrective action, and ultimately terminating her employment." Compl. ¶37.  Defendant moves for summary judgment on the grounds that Plaintiff cannot establish a *prima facie* case of disability discrimination and, even if the record supported a *prima facie* case, Defendant has put forth sufficient unrebutted evidence of a legitimate, non-discriminatory reason for its termination decision.

### A.  Standards

Under Oregon law, it is unlawful for an employer to discharge an employee on the basis of a disability.  O.R.S. 659A.112(1).  In analyzing claims of intentional employment discrimination in violation of either state or federal law, federal courts apply the burden-shifting analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817 (1973). See Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080, 1092 (9th Cir.2001), cert. denied, 534 U.S. 888, 122 S.Ct. 201 (2001).

The Oregon statute is construed consistently with similar provisions of the federal Americans with Disabilities Act of 1990 ("ADA"). Snead, 237 F.3d at 1087; see O.R.S. 659A.139.  Therefore, the standard for establishing a prima facie case of disability discrimination under Oregon law is identical to that used in cases arising under the federal statute.  Snead, 237

F.3d at 1087.  A plaintiff establishes a prima facie case of disability discrimination by showing

that she 1) is disabled; 2) is a qualified individual; and 3) suffered an adverse employment action

because of her disability.  Id. A "qualified individual" under the ADA is one who is capable of

performing the essential functions of the job, with or without a reasonable accommodation.

Hutton v. Elf Atochem N. Am., Inc., 273 F.3d 884, 891 (9th Cir. 2001).  Additionally, Oregon's

statute specifies that an employer also discriminates by not making "reasonable accommodation

to the known physical or mental limitations of a qualified individual with a disability who is [an]

employee." O.R.S. 659A.112(2)(e).

      If the employee makes out a *prima facie* case of unlawful discrimination on the basis of

disability, the burden shifts to the employer to produce a legitimate, nondiscriminatory reason for

the adverse employment decision.  If the employer meets this burden of production, the plaintiff

must establish that the employer's proffered reason is mere pretext and that the decision, in fact,

constituted unlawful discrimination.  Texas Dep't of Community Affairs v. Burdine, 450 U.S.

248, 256, 101 S.Ct. 1089 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct.

1817 (1973).

**B.  Analysis**

      In opposition to the motion for summary judgment, Plaintiff argues that "there is no

meaningful dispute" that she was disabled at the time of her termination. Resp. at 9.  Plaintiff

also argues that Defendant failed to provide her reasonable accommodation and that their reason

for terminating her employment is pretextual.

      Defendant argues that because Plaintiff can establish neither a *prima facie* case of

disability discrimination nor pretext her claim should be dismissed.  I agree.

**1.  *Prima Facie* Case**

A careful review of the record supports only the conclusion that Plaintiff cannot meet her burden of establishing a *prima facie* case of disability discrimination.  After her 2013 medical leave, Plaintiff's physician cleared her for a return to full duty with no restrictions starting November 21, 2013.  Plaintiff testified that when she returned to work in November 2013 she "felt fine." When asked during her deposition whether she believed she had a disability, either mental or physical, while she worked at Providence, Plaintiff responded "No."  When asked if she had any impairment from any medical condition when she reported for work for her December 1st/2nd shift, Plaintiff responded "No" and agreed that she would not have reported to work if she felt she was impaired.  Plaintiff testified that she had intermittently told "them, 'One nurse can't do this job'" and that she felt that there was too much work for one person. Pl. Dep. at 174:14-25.  However, Plaintiff was also asked whether she felt that she needed any accommodation or modification to her job from the time she returned to work in 2011 up until the end of her employment.  Plaintiff responded that her answer "would be no."

To bolster her argument, Plaintiff cites to statements in her May 11, 2015 Declaration that her "illness substantially impaired major life activities . . ." and provides characterizations of her deposition testimony that are not supported by the record.  In light of an otherwise total lack of evidence of disability, Plaintiff's subsequent contradictory statements and interpretations of her testimony are unpersuasive and fail to create a genuine issue of material fact.  On this record, a trier of fact could not conclude that the requirements for establishing a disability discrimination claim have been met.

**2. Reasonable Accommodation**

In her Response and at oral argument, Plaintiff asserted a failure to accommodate claim. This claim fails for at least two reasons. First, Plaintiff did not allege a failure to accommodate claim in her Complaint.  As Defendant correctly asserted at oral argument, it is improper for a plaintiff to raise a new theory for the first time in opposition to summary judgment. Vasnaik v. Providence Health & Services-Oregon, 3:14-cv-00027-HZ, 2015 WL 2201915, at *9 (D. Or. May 9, 2015)(citing Patel v. City of Long Beach, 564 Fed. Appx. 881, 882 (9th Cir.2014); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1292–93 (9th Cir.2000)).  Second, as discussed above, Plaintiff has failed to produce evidence from which a trier of fact could conclude that she had a disability within the meaning of the statute.  Absent such evidence, Plaintiff cannot show that she was a "qualified individual with a disability" entitled to reasonable accommodation.

**3. Pretext**

Plaintiff has failed to produce evidence supporting a *prima facie* case of disability discrimination.  However, even if Plaintiff had produced such evidence, she has not shown evidence from which a trier of fact could conclude that the Defendant's proffered reason for terminating her employment was a pretext for unlawful discrimination.

As discussed above, Defendant's evidence showing that Plaintiff's termination was a result of the disorganization, neglect of patients and overall poor nursing practices she exhibited on the night of her last shift shows a legitimate, non-discriminatory reason for its decision. Defendant has submitted the investigative report prepared by Thompson documenting Plaintiff's harmful and troubling conduct. Plaintiff's own testimony fails to refute that such conduct occurred. The record also contains determinations by DHS that Plaintiff's conduct that night

constituted abuse.  In addition, Defendant has submitted Thompson's sworn statement that her decision to terminate Plaintiff's employment was based entirely on Plaintiff's actions on her final shift and, at the time of her decision to discharge Plaintiff, she knew nothing about Plaintiff having a disability. As with her FMLA and OFLA claims, Plaintiff has not offered any evidence to support her argument that her serious lapses in patient care the night of her final shift were a mere pretext for her termination. Under the circumstances, Plaintiff's disability discrimination claim would fail even if she could establish a *prima facie* case of unlawful discrimination. I, therefore, grant Defendant's motion for summary judgment as to Plaintiff's Fourth Claim.


## Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [#14] is GRANTED and this case is dismissed with prejudice.  Defendant's counter claim for attorney fees [#5] is DENIED.

DATED this 14th day of July, 2015.


_____/s/ John Jelderks_____
John Jelderks
U.S. Magistrate Judge